**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

| | |
|---|---|
| Nader Cheetany, et al., | Case No. 2:20-cv-01692-GMN-DJA |
| Plaintiff, | |
| v. | **Report and Recommendation** |
| Peter M. Bergstrom, et al., | |
| Defendants. | |

Before the Court is Plaintiffs' motion for default judgment against Defendants Peter M. Bergstrom; Destination Online, L.L.C.; and OurID, Inc.  (ECF No. 15).  Plaintiffs—Nader Cheetany, Eva Garcia-Mendoza, Esad Morina, and Martyn James Ravenhill—filed the operative complaint alleging: (1) Alter Ego Liability; (2) Securities Fraud – Violations of Securities and Exchange Act of 1934, Rule 10(b) and Securities and Exchange Commission Rule 10b-5; (3) Securities Fraud as Controlling Person – Violations of § 20(a) of the Securities and Exchange Act of 1934; (4) Securities Fraud Pursuant to NRS Chapter 90; (5) Fraud; (6) Deceptive Trade Practices/Consumer Fraud; (7) Conversion; (8) Unjust Enrichment; and (9) Accounting.  Each of the Defendants were served with copies of the summons and complaint but have failed to answer or otherwise respond.  (ECF Nos. 10-12).

On April 1, 2021, Plaintiffs moved for the clerk to enter an entry of default against Defendants.  (ECF No. 13).  The Clerk entered a default against Defendants on April 15, 2021. (ECF No. 14).  Plaintiffs now seek an entry of default judgment against Defendants, jointly and severally in the principal amount of $1,480,000.00.  (ECF No. 15).  Plaintiffs also seek punitive or statutory damages in the amount of $4,440,000.00.  (*Id.*).  Plaintiffs ask that any judgment include all applicable prejudgment and post-judgment interest.  (*Id.*).  Because the Court finds that Plaintiffs have demonstrated that default judgment is appropriate here on both their

compensatory and punitive damages, but that the punitive damages should be limited, the Court recommends granting in part and denying in part Plaintiffs' motion for default judgment.

## I.    Alleged facts.

In their complaint, Plaintiffs allege the following facts.  (ECF No. 1).  Bergstrom sold securities to Plaintiffs in exchange for approximately $1,480,000  (*Id.* at 1).  Defendants—Bergstrom and his companies, Destination Online, LLC and OurID, Inc.—engaged in a complex scheme to sell membership interests in various businesses to Plaintiffs, including providing the Plaintiffs with fraudulent business projections and prospectuses, and making blatant misrepresentations about ongoing operations.  (*Id.* at 1-2).  Plaintiffs later learned that Defendants' representations were knowingly false in violation of the Securities Exchange Act of 1934.  (*Id.*).

### A.    Cheetany, Garcia, and Ravenhill's investments.

Bergstrom formed Destination Online in 2017.  (*Id.* at 4).  At the time of its formation, Bergstrom was the sole manager and member of Destination Online.  (*Id.*).  Bergstrom began soliciting investments from Cheetany, Garcia, and Ravenhill in early 2018.  (*Id.*).  Bergstrom represented that Destination Online had been organized to develop, market, and sell effective and affordable identity protection services to end users in the United States and around the world. (*Id.*).  Bergstrom also represented that he had developed a successful company—EyeonID.com— in Sweden which performed similar services in Europe.  (*Id.*).  Bergstrom provided Cheetany, Garcia, and Ravenhill with an investment memorandum which represented that Destination Online was progressing in its development, projected to be profitable, and only needed $1,000,000 from Cheetany, Garcia, and Ravenhill to complete all software development, initiate the product launch, and finance operations and marketing activities for the rest of 2018.  (*Id.*).

Based on these representations, Cheetany invested $30,000, Garcia invested $100,000, and Ravenhill invested $700,000.  (*Id.* at 6-7).  Garcia and Ravenhill were aware of each other's investments, but not of Cheetany's.  (*Id.*).  Garcia and Ravenhill became aware of Cheetany's investment in December 2019.  (*Id.*).  After Cheetany, Garcia, and Ravenhill's investments,

1   Bergstrom made material changes to the investment memorandum that he did not disclose to

2   Cheetany, Garcia, and Ravenhill.  (*Id.* at 8).

3           Around July 2018, Bergstrom updated Garcia and Ravenhill about Destination Online's

4   progress.  (*Id.*).  A few months later, Bergstrom met with Garcia and Ravenhill to request

5   additional investments, representing that product development was almost done.  (*Id.*).  Garcia

6   invested an additional $100,000.  (*Id.*).  Ravenhill invested an additional $300,000.  (*Id.*).  In June

7   of 2019. Cheetany agreed to loan Bergstrom an additional $50,000.  (ECF No. 15-1 at 5). [1]

8           Around February 2019, Bergstrom formed OurID, due to the confusion caused by the

9   name of Destination Online because the nature of the business was identity protection and not

10  travel.  (ECF No. 1 at 9).  Bergstrom explained this to Garcia and Ravenhill and told them he

11  would assign all of Destination Online's technology and intellectual property rights to OurID and

12  that Garcia and Ravenhill's ownership interests would also be transferred to OurID.  (*Id.* at 8-9).

13  Bergstrom also informed Garcia and Ravenhill that the Destination Online product—an

14

15  _____

    [1] In his declaration—attached to the motion for default judgment—Cheetany asserts that, after
16  making the initial $30,000 investment, he would periodically check in with Bergstrom.  (ECF No.
    15-1 at 5).  Bergstrom misrepresented that the software development was nearly complete and
17  that he was reaching sponsorship deals with the Las Vegas Golden Knights, Emirates Airlines,
    and Microsoft.  (*Id.*).  Bergstrom also represented that he would be creating OurID to ease
18  confusion over the name "Destination Online" and transferring Cheetany's ownership interests
    into OurID.  (*Id.*).  Based on these representations, Cheetany asserts that he agreed to loan
19  Bergstrom an additional $50,000 on June 21, 2019 and issued a cashier's check on that date.  (*Id.*
    at 5, 60).  Cheetany attaches a copy of that cashier's check to his declaration.  (*Id.* at 60).
20
    However, these allegations are not present in the complaint.  To the contrary, the complaint—
21  while it contains the same total damages of $1,480,000 as the motion for default judgment—does
    not mention Cheetany's additional $50,0000 loan or the misrepresentations in reliance on which
22  Cheetany made the loan.  It only discusses the additional investments by Ravenhill and Garcia.
    (ECF No. 1 at 8-13).
23
    Nonetheless, as discussed more fully below, while the Court accepts as true the factual allegations
24  in a complaint for the purposes of default, it does not accept those relating to damages as true in
    calculating the amount of damages upon default.  *See Geddes v. United Financial Group*, 559
25  F.2d 557, 560 (9th Cir. 1977).  Because Cheetany has provided a declaration that he loaned
    Bergstrom an additional $50,000 which he did not receive back and proof of that cashier's check,
26  the Court will consider the facts surrounding Cheetany's additional investment in determining the
    amount of damages, but not in recounting the facts or determining the sufficiency of Plaintiffs'
27  claims.

28

application for smartphones—was set to launch in February 2019. (*Id.*). The launch date passed with no launch. (*Id.*). Garcia and Ravenhill became concerned and then began requesting financial documents from Bergstrom. (*Id.*). Bergstrom did not provide them, despite numerous requests. (*Id.*). In April 2019, Bergstrom told Garcia and Ravenhill that the product was launched, but this was untrue. (*Id.*). A few days later, Bergstrom told Garcia and Ravenhill that the product was having problems. (*Id.*).

After Garcia demanded it, Bergstrom finally provided Garcia and Ravenhill a copy of Destination Online's bank statements from January 2019 to April 2019. (*Id.*). Garcia and Ravenhill were shocked to find that Destination Online was out of money and that Bergstrom had spent hundreds of thousands of investment dollars on personal expenses. (*Id.*). Garcia and Ravenhill then requested to be bought out and to see all financial records. (*Id.* at 10). Bergstrom agreed, but then failed to produce the records and then failed to provide the buyout payments. (*Id.*). Bergstrom then stopped communicating with Garcia and Ravenhill. (*Id.*).

### B.    Morina's investments.

In September 2019, Bergstrom approached Morina to become an investor in OurID, making the same representations to Morina as he did to Cheetany, Garcia, and Ravenhill. (*Id.* at 13). But Bergstrom did not tell Morina about Cheetany, Garcia, and Ravenhill's prior investments. (*Id.*). Bergstrom presented Morina with an investment memorandum that included representations of the OurID's progress, necessary capital to start up, and profit projections. (*Id.* at 13-14). Bergstrom also represented to Morina that OurID would employ Morina as its vice president of client relationships and that it would pay Morina a base salary of $140,000 per year. (*Id.*).

Morina invested $200,000 in OurID and agreed to serve as its vice president. (*Id.* at 14-15). However, OurID failed to pay Morina his base salary or provide him with benefits. (*Id.*). Bergstrom also refused to provide Morina with any financial accounting or updates on the company's progress. (*Id.*).

1        **C.        *Plaintiffs discover the fraud.***

2            Plaintiffs investigated Bergstrom, Destination Online, and OurID and discovered that

3    Bergstrom made false representations to induce Plaintiffs to invest.  (*Id.* at 15).  Of note,

4    Bergstrom had lied about the success of EyeonID.com, when really, the company had no revenue

5    since 2014 and Bergstrom was removed from his managerial position for misusing company

6    funds for personal expenses.  (*Id.* at 4).  Bergstrom did not even have the exclusive right to use

7    the EyeonID.com product, belying his representation that he intended to bring the product to the

8    United States through Destination Online.  (*Id.*).

9            Bergstrom also made misrepresentations about Destination Online and OurID in the

10   investment memorandums he provided to Plaintiffs.  (*Id.*).  These included—among others—

11   misrepresentations about the purpose of the companies, the progress of development, the profit

12   projections, and where the investment money would go.  (*Id.* at 10-13).  Notably, after presenting

13   the Destination Online investment memorandums to Cheetany, Garcia, and Ravenhill, Bergstrom

14   later changed the financial projections to demonstrate far less profits, and even net losses, but

15   never provided Cheetany, Garcia, or Ravenhill with the updated memorandums.  (*Id.* at 8).

16           Bergstrom also continually misrepresented the progress that Destination Online and

17   OurID were making.  (*Id.*).  In his initial representations to Cheetany, Garcia, and Ravenhill

18   regarding Destination Online, Bergstrom misrepresented that Destination Online had completed

19   or commenced certain stages of developing its product: a smartphone application.  (*Id.* at 11).  He

20   later gave Garcia and Ravenhill false updates about the product's development to induce them to

21   invest more money.  (*Id.* at 8-9).  Those updates included false claims that software teams were

22   on schedule to launch the product, that Bergstrom was in discussions with Emirates Airlines and

23   Microsoft, and that the product was nearing completion.  (*Id.* at 8-11).  But really, many of the

24   promised developments were either not commenced or not completed, Bergstrom had not met

25   with Emirates Airlines or Microsoft, and the product was far from completion.  (*Id.*).

26           The Plaintiffs also learned that Bergstrom's promises in the Destination Online and OurID

27   investment memorandums that their investments would be put to company development were

28   false.  (*Id.* at 11, 14).  Instead, Bergstrom put the investment money to his own use for personal

1    expenses. (*Id.* at 16). Additionally, Bergstrom's representations to Morina that OurID would

2    employ him were false because Morina never received his salary. (*Id.* at 15-16).

3        On May 15, 2020, Plaintiffs sent Bergstrom a letter demanding detailed financial

4    statements and bank statements for Destination Online and OurID. (*Id.*). That letter also

5    demanded that Destination and OurID hold an annual meeting of its members and shareholders

6    because Bergstrom—as manager of Destination Online and president of OurID—had never held

7    an annual meeting of members or shareholders for either company since their formations. (*Id.*).

8    Instead of complying with the letter, Bergstrom began making threats to Ravenhill. (*Id.* at 17).

9        Plaintiffs assert that, upon information and belief Bergstrom—a citizen of Sweden

10    currently residing in the Republic of Moldova—has not returned to the United States since

11    December 2019. (ECF No. 1 at 2). Although Plaintiffs served Destination Online and OurID's

12    registered agents and Bergstrom executed a waiver of the service of summons, no Defendant has

13    responded to the complaint or participated in the case. (ECF No. 15 at 18). Plaintiffs believe that

14    Defendants are actively evading any involvement in the case. (*Id.*).

15    **II.    Standard.**

16        The granting of a default judgment is a two-step process directed by Rule 55 of the

17    Federal Rules of Civil Procedure. Fed. R. Civ. P. 55; *Eitel v. McCool*, 782 F.2d 1470, 1471 (9th

18    Cir. 1986). The first step is an entry of clerk's default based on a showing, by affidavit or

19    otherwise, that the party against whom the judgment is sought "has failed to plead or otherwise

20    defend." Fed. R. Civ. P. 55(a). The second step is a default judgment under Rule 55(b), a

21    decision which lies within the discretion of the court. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th

22    Cir. 1980). Factors which a court, in its discretion, may consider in deciding whether to grant a

23    default judgment include: (1) the possibility of prejudice to the plaintiff; (2) the merits of the

24    substantive claims; (3) the sufficiency of the complaint; (4) the amount of money at stake; (5) the

25    possibility of a dispute of material fact; (6) whether the default was due to excusable neglect; and

26    (7) the Federal Rules' strong policy in favor of deciding cases n their merits. *Eitel*, 782 F.2d at

27    1471-72.

28

1    If an entry of default is made, the court accepts all well-pleaded factual allegations in the

2    complaint as true; however, conclusions of law and allegations of fact that are not well-pleaded

3    will not be deemed admitted by the defaulted party. *DirecTV, Inc. v. Hoa Huynh*, 503 F.3d 847,

4    854 (9th Cir. 2007). Additionally, the Court does not accept factual allegations relating to the

5    amount of damages as true. *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977).

6    Default establishes a party's liability, but not the amount of damages claimed in the pleading. *Id.*

7    **III.    Discussion.**

8    In considering the seven *Eitel* factors, the Court recommends that default judgment

9    against Defendants is warranted. The first and sixth factors favor granting default judgment

10   because Defendants have failed to defend or appear at all in this matter since being served with

11   the summons and complaint in November and December of 2020. Defendants' failure to appear

12   for over a year prejudices Plaintiffs by preventing them from recovering the full amount of money

13   they invested in Defendants based on false representations. Further, Defendants' failure to appear

14   for a substantial time demonstrates the lack of excusable neglect. And while the seventh factor

15   generally counsels against the granting of default judgment, Defendants' failure to appear

16   prevents the Court from determining the claims on their merits.

17   The Court next examines the merits of the substantive claims and sufficiency of the

18   complaint. Plaintiffs seek default judgment for: (1) their federal securities fraud claim; (2) their

19   state securities fraud claim; (3) their fraudulent misrepresentation claim; (4) their deceptive trade

20   practices and consumer fraud claim; (5) their conversion claim; and (6) their unjust enrichment

21   claim. The Court finds that the second and third *Eitel* factors—the merits of the substantive

22   claims and the sufficiency of the complaint—favor judgment for Plaintiffs on all but the unjust

23   enrichment claim.

24       ***A.    Merits of the substantive claims.***

25           1.    <u>Alter ego liability.</u>

26   As a preliminary matter, the Court considers Bergstrom to be the alter ego of Destination

27   Online and OurID for the purposes of liability. Plaintiffs assert that "[t]o the extent any claims

28   are made against Destination and OurI[D], those claims should apply equally against Bergstrom,

1    as Bergstrom has demonstrated himself to be the alter ego of Destination and OurI[D], and

2    therefore, to the extent Destination and OurI[D] are entitled to any corporate protections those

3    protections do not apply in this case.  (ECF No. 15 at 17-18).  Nevada law governs this

4    Court's alter-ego analysis.  *See Towe Antique Ford Found. v. I.R.S.*, 999 F.2d 1387, 1391 (9th

5    Cir. 1993) (citing *Wolfe v. United States*, 806 F.2d 1410, 1411 n.3 (9th Cir. 1986), *cert. denied*,

6    482 U.S. 927 (1987)) ("[The court] appl[ies] the law of the forum state in determining whether a

7    corporation is an alter ego of the taxpayer.").  Under Nevada law, "the 'essence' of

8    the alter ego doctrine is to 'do justice' whenever it appears that the protections provided by the

9    corporate form are being abused."  *LFC Mktg. Grp., Inc. v. Loomis*, 116 Nev. 896, 902-903, 8

10   P.3d 841, 845–46 (Nev. 2000) (citing *Polaris Industrial Corp. v. Kaplan*, 103 Nev. 598, 603, 747

11   P.2d 884, 888 (Nev. 1987)). The Court considers three "general requirements" when deciding

12   whether to apply the alter ego doctrine:

13
14              (1) the corporation must be influenced and governed by the person
                asserted to be the alter ego; (2) there must be such unity of interest
15              and ownership that one is inseparable from the other; and (3) the
                facts must be such that adherence to the corporate fiction of a
16              separate entity would, under the circumstances, sanction fraud or
                promote injustice.

17   *Polaris Indus. Corp.*, 103 Nev. at 601, 747 P.2d at 886 (citing *McCleary Cattle Co. v.

18   Sewell*, 73 Nev. 279, 282, 317 P.2d 957, 959 (Nev. 1957)); *see also* NRS 78.747.

19          Because "[t]he general rule of law is that upon default the factual allegations of the

20   complaint, except those relating to the amount of damages, will be taken as true," the Court finds

21   that the allegations in the complaint are sufficient to warrant piercing the corporate veil.  *Geddes

22   v. United Fin'l Grp.*, 559 F.2d at 560.  Plaintiffs have alleged that Bergstrom is the sole manager

23   of Destination Online and the president of OurID.  Plaintiffs have also alleged that Bergstrom

24   made various misrepresentations in his capacity as manager and president of these companies.  To

25   allow Bergstrom to escape liability for Destination Online's and OurID's conduct would be to

26   sanction his use of these companies in furtherance of the alleged fraud.  The Court thus views

27   Bergstrom the same as Destination Online and OurID for the purposes of liability in this action.

28

1

2.    Federal securities fraud claim.[2]

2      Section 10(b) of the Securities and Exchange Act prohibits the use of "any manipulative

3   or deceptive device or contrivance" related to the purchase or sale of securities when the use

4   violates the regulations promulgated by the Securities and Exchange Commission.  15 U.S.C.

5   § 78j(b).  Under SEC Rule 10b-5, it is unlawful for any person "[t]o make any untrue statement of

6   fact or to omit to state a material fact necessary in order to make the statements made, in the light

7   of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).

8   "To recover damages for violations of Section 10(b) and Rule 10b-5, a plaintiff must prove (1) a

9   material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between

10  the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

11  misrepresentation or omission; (5) economic loss; and (6) loss causation."  *In re Quality Sys., Inc.*

12  *Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017).

13     To show a material misrepresentation the plaintiff must "specify each statement alleged to

14  have been misleading, [and] the reason or reasons why the statement is misleading.".  15 U.S.C.

15  § 78u–4(b)(1).  "A litany of alleged false statements, unaccompanied by the pleading of specific

16  facts indicating why those statements were false, does not meet this standard."  *Metzler Inv.*

17  *GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).  However, a "mildly

18  optimistic, subjective assessment hardly amounts to a securities violation," so courts must

19  distinguish material misrepresentations from "puffery."  *Oregon Pub. Employees Ret. Fund v.*

20  *Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014).  "Statements by a company that are capable

21  of objective verification are not puffery and can constitute material misrepresentations."  *Id.*

22

23   _____

24  [2] Plaintiffs refer to this claim broadly as "Federal Securities Fraud Claims," however, they only address their claims arising under Section 10(b) of the Exchange Act and Rule 10b-5, not their claim arising under Section 20(a).  *Compare* (ECF No. 15 at 19) *with* (ECF No. 1 at 20-21).

25  Section 20(a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable

26  jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable…"  15 U.S.C. § 78t(a).  Because the Court is considering

27  Defendants to be jointly and severally liable under the alter ego doctrine, the Court does not

28  address this securities claim further.

1   (quotation omitted).  And, "general statements of optimism, when taken in context, may form a

2   basis for a securities fraud claim when those statements address specific aspects of a company's

3   operation that the speaker knows to be performing poorly." *In re Quality Sys.*, 865 F. 3d at 1143

4   (quotation omitted).  "For example, reassuring investors that 'everything [was] going fine' with

5   FDA approval when the company knew FDA approval would never come was materially

6   misleading." *Id.* (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)).

7          To show scienter, a plaintiff must "state with particularity facts giving rise to a strong

8   inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

9   The "required state of mind is a mental state that not only covers intent to deceive, manipulate, or

10  defraud, but also deliberate recklessness." *In re Quality Sys.*, 865 F.3d at 1144 (quotation

11  omitted). "[D]eliberate recklessness is an extreme departure from the standards of ordinary care ...

12  which presents a danger of misleading buyers or sellers that is either known to the defendant or is

13  so obvious that the actor must have been aware of it." *Schueneman v. Arena Pharm., Inc.*, 840

14  F.3d 698, 705 (9th Cir. 2016) (quotation omitted).  To assess whether the FAC meets this

15  standard, courts "must ask: When the allegations are accepted as true and taken collectively,

16  would a reasonable person deem the inference of scienter at least as strong as any opposing

17  inference?" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007).

18         The Court finds that Plaintiffs have sufficiently alleged the elements for violations of

19  Section 10(b) and Rule 10b-5.  First, Plaintiffs have alleged that Defendants—through

20  Bergstrom—made material misrepresentations or omissions.  Plaintiffs have outlined the

21  misleading statements that Bergstrom made and why they were misleading.  These include,

22  amongst others:

23         • Bergstrom's statement that, after creating EyeonID.com in 2014, he developed it

24            to a company with a valuation of $40 million was misleading because

25            EyeonID.com had not had any revenue since 2014 and Bergstrom was removed

26            from his managerial position.

27         • Bergstrom's representation that he intended to bring EyeonID.com to the United

28            States through Destination Online was false because Bergstrom did not have the

exclusive right to use the EyeonID.com product in connection with Destination Online.

- Bergstrom's representations in the investment memorandums provided to Cheetany, Garcia, and Ravenhill were false because he later changed much of the data—including financial projections—without telling Cheetany, Garcia, and Ravenhill.

- Bergstrom's representations that much of the product development was underway or completed was false because Destination Online had not completed certain projects or even started on others when promised.

- Bergstrom's representations that Plaintiffs' investments would fund Destination Online's development were false because Bergstrom used the money for personal expenses.

- Bergstrom's interim update to Garcia and Ravenhill included false statements about Destination Online's progress because the software development teams were not on time and likely nonexistent, the target launch date was false and the product to be launched was far from completion, and the marketing discussions Bergstrom claimed to have did not exist.

- Bersgrsom's representations to Morina that OurID would employ him was false because OurID never paid Morina his salary.

These statements are not puffery, or mildly optimistic subjective assessments. Instead, they are capable of objective verification and, when verified, Plaintiffs allege that they proved to be false. To the extent that certain of Bergstrom's statements—for example, the target launch date or projected financials—can be taken as general statements of optimism, they addressed specific aspects of the company's operation—its main product and financial outcome—which Plaintiffs allege Bergstrom knew were performing poorly. These statements amounting to "everything is going fine," when the product and companies were languishing, were materially misleading.

Second, Plaintiffs have alleged scienter.  Even if Bergstrom did not intend to mislead Plaintiffs, he acted at the very least with deliberate recklessness.  Presenting EyeonID.com as a successful business when Bergstrom had been removed as manager and the company had not had profits since 2014 was obviously misleading.  Presenting financial projections that he later changed without telling Plaintiffs was obviously misleading.  And presenting such positive projections regarding product development when many steps were not even underway was obviously misleading.  Taken as true and taken collectively, a reasonable person would deem the inference of scienter at least as strong as any opposing inference here.  This is particularly true because Plaintiffs allege that Bergstrom ultimately used their money for personal expenses, demonstrated through bank statements they attach to their motion for default judgment.

Third, Plaintiffs have alleged a connection between the misrepresentations Bergstrom made to them and their investments in his companies because Plaintiffs allege to have relied on Bergstrom's presentation of the companies as successful and his methods as experiencing previous success in deciding to invest.  Fourth, Plaintiffs allege reliance because they assert that they acted in reliance on Bergstrom's investment memorandums and representations when deciding to buy shares in the company.  Fifth, Plaintiffs have asserted economic loss through the money they invested.  And sixth, they have demonstrated that Bergstrom's misrepresentations caused the loss.

        3.     <u>State securities fraud claim.</u>

Under NRS 90.660—titled "Civil liability"—"[a] person who offers or sells a security in violation of…Subsection 2 of NRS 90.570…is liable to the person purchasing the security."

NRS 90.570(2) states:

> In connection with the offer to sell, sale, offer to purchase or purchase of a security, a person shall not, directly or indirectly:
> …
> 2. Make an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made not misleading in the light of the circumstances under which they are made…

1    Here, Plaintiffs have demonstrated that Defendants violated NRS 90.570(2). As discussed

2    above, Bergstrom, acting on behalf of Destination Online and OurID made untrue statements of

3    material facts. And Plaintiffs have alleged that, acting in reliance on those statements, they

4    invested in Destination Online and OurID. The Court finds that Plaintiffs have sufficiently

5    alleged violations of Nevada securities statutes.

6            4.    Fraudulent misrepresentation claim.

7    "Under Nevada law, [a plaintiff] has the burden of proving each and every element of his

8    fraudulent misrepresentation claim by clear and convincing evidence: (1) a false representation

9    made by the defendant; (2) defendant's knowledge or belief that its representation was false or

10   that defendant has an insufficient basis of information for making the representation;

11   (3) defendant intended to induce plaintiff to act or refrain from acting upon the misrepresentation;

12   and (4) damage to the plaintiff as a result of relying on the misrepresentation." *Barmettler v.*

13   *Reno Air, Inc.*, 114 Nev. 441, 446-47, 956 P.2d 1382, 1386 (Nev. 1998). "Fraud is never

14   presumed; it must be clearly and satisfactorily proved." *Havas v. Alger*, 85 Nev. 627, 631, 461

15   P.2d 857, 860 (Nev. 1969).

16   Here Plaintiffs have alleged that Bergstrom, individually and through Destination Online

17   and OurID, made fraudulent misrepresentations. Each Plaintiff has submitted a signed

18   declaration describing the oral and written misrepresentations that Bergstrom made to them, when

19   he made those misrepresentations, when and how each Plaintiff agreed to invest based on those

20   misrepresentations, and how they discovered that the information Bergstrom provided was false.

21   Those declarations attach the investment memorandums Bergstrom provided each Plaintiff, the

22   agreements each Plaintiff signed, the checks and wire transfers each Plaintiff sent in connection

23   with the investments, and emails Bergstrom sent after Plaintiffs confronted him. (ECF No. 15-1)

24   (Nader Cheetany); (ECF No. 15-2) (Eva Garcia-Mendoza); (ECF No. 15-3) (Martyn James

25   Ravenhill); (ECF No. 15-4) (Esad Morina. The Court finds, accepting these supported

26   allegations as true, that there are sufficient facts to support a finding in favor of Plaintiffs against

27   Defendants on the fraudulent misrepresentation claim.

28

1              5.     <u>Deceptive trade practices and consumer fraud.</u>

2        Under NRS 41.600, "[a]n action may be brought by any person who is a victim of

3 consumer fraud," which is defined as "[a] deceptive trade practice as defined in" the Nevada

4 Deceptive Trade Practices Act.  NRS 41.600(1), (2)(e).  Under NRS 598.092 of that Act,

> A person engages in a 'deceptive trade practice' when in the course of his or her business or occupation he or she…[a]dvertises or offers an opportunity for investment and…(b) [r]epresents that the investment will earn a rate of return which he or she knows or has reason to know is false or misleading; (c) [m]akes any untrue statement of a material fact or omits to state a material fact which is necessary to make another statement, considering the circumstances under which it is made, not misleading; (d) [f]ails to maintain adequate records so that an investor may determine how his or her money is invested; (e) [f]ails to provide information to an investor after a reasonable request for information concerning his or her investment; [or] (f) [f]ails to comply with any law or regulation for the marketing of securities or other investments…

13 Here, for the same reasons they have successfully alleged violations of federal and state

14 securities law and fraudulent misrepresentation, Plaintiffs have alleged that Defendants violated

15 NRS 598.092 by engaging in a deceptive trade practice.  Plaintiffs have alleged that Bergstrom

16 represented that Destination Online and OurID were projected to make significant profits that

17 were ultimately untrue, that Bergstrom made numerous misrepresentations about the companies'

18 progress and his former successes with EyeonID.com, that Bergstrom did not provide company

19 records to Plaintiffs when requested, that Bergstrom did not provide information concerning the

20 Plaintiffs' investments other than a bank statement from January 2019 to April 2019, and that

21 Bergstrom failed to hold required annual meetings.  The Court finds each of these to constitute

22 deceptive trade practices and violations of NRS 41.600.

23              6.     <u>Conversion.</u>

24 Conversion is "a distinct act of dominion wrongfully exerted over another's personal

25 property in denial of, or inconsistent with his title or rights therein *or* in derogation, exclusion, or

26 defiance of such rights."  *M.C. Multi-Family Development, L.L.C. v. Crestdale Associates, Ltd.*,

27 124 Nev. 901, 910-911, 193 P.3d 536, 542-43 (Nev. 2008) (internal citations and quotations

28 omitted) (emphasis in original).  "Additionally, conversion is an act of general intent, which does

not require wrongful intent and is not excused by care, good faith, or lack of knowledge." *Id.* (internal citations and quotations omitted). "Whether conversion has occurred is…a question of fact for the jury." *Id.* (internal citations and quotations omitted).

Plaintiffs have alleged conversion. They assert that they invested money in Bergstrom's companies—Destination Online and OurID—but Bergstrom instead spent the money on personal expenses. Bergstrom's use of the money was inconsistent with Plaintiffs' rights and expectations that their money would be used to develop Destination Online and OurID into successful companies which would eventually result in returns on their investments.

### 7.    Unjust enrichment.

The doctrine of unjust enrichment applies when there is no legal contract, but the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain but should deliver to another or should pay for. *See Snider v. Lithia Real Est., Inc.*, No. 3:11-cv-0596-HDM, 2011 WL 4062375, at *1-2 (D. Nev. Sept. 12, 2011). The elements are: (1) a benefit conferred on the defendant by the plaintiff; (2) appreciation by the defendant of such a benefit; and (3) acceptance and retention by the defendant of such a benefit. *Unionamerica Mortg. & Equity Tr. v. McDonald*, 97 Nev. 210, 211-12, 626 P.2d 1272, 1273 (1981). An action based on a theory of unjust enrichment is not available when there is an express, written contract or agreement. *Leasepartners Corp v. Robert L. Brooks Trust*, 113 Nev. 747, 756, 942 P.2d 182, 187 (1997). However, while a plaintiff may assert inconsistent theories of recovery at the pleading stage, the Northern District of California has discussed that a plaintiff may not plead the existence of an enforceable contract and simultaneously maintain an unjust enrichment claim unless the plaintiff also pleads facts suggesting that the contract may be unenforceable or invalid. *See Saroya v. University of the Pacific*, 503 F.Supp.3d 986, 998-99 (N.D. Cal. 2020) (citing Fed. R. Civ. P. 8(d)(3)).

Plaintiffs have not sufficiently alleged unjust enrichment. Although Plaintiffs do not make any breach of contract claims, they attach their agreements to their declarations as proof of the amount they agreed to invest in Destination Online and OurID. In their complaint and their motion, they also assert that they plead their unjust enrichment claim in the alternative. (ECF No.

1 at 26); (ECF No. 15 at 26).  The Court finds the Northern District of California's analysis that

an unjust enrichment claim requires facts suggesting that the contract may be unenforceable or

invalid persuasive here.  And because Plaintiffs neither plead any facts that the agreements they

signed are unenforceable or invalid, nor address this point in their motion for default judgment,

the Court does not find this claim sufficiently plead.  Without more, the Court is not inclined to

consider the agreements as support for the Plaintiffs' asserted damages while simultaneously

disregarding their validity for the purposes of the Plaintiffs' unjust enrichment claims.  The Court

thus finds that Plaintiffs' unjust enrichment claim is without merit.  The Court thus recommends

granting default judgment on Plaintiffs': (1) federal securities law claim; (2) state securities law

claim; (3) fraudulent misrepresentation claim; (4) deceptive trade practices and consumer fraud

claim; and (5) conversion claim.  The Court recommends denying default judgment on Plaintiffs'

unjust enrichment claim.

### B.    Damages.

#### 1.    Compensatory damages.

If an entry of default is made, the court accepts all well-pleaded factual allegations in the

complaint as true.  *DirecTV, Inc. v. Hoa Huynh*, 503 F.3d 847, 854 (9th Cir. 2007).  The court

does not accept factual allegations relating to the amount of damages as true, and while default

establishes a party's liability, it does not establish the amount of damages claimed in the pleading.

*Geddes*, 559 F.2d at 560.  Under Local Rule 7-2(d), if an opposing party fails to respond to a

motion, it constitutes that party's consent to the granting of the motion.

Here, the Court recommends that Plaintiffs be awarded the $1,480,000 they allege to have

invested, and lost, in reliance on Bergstrom's misrepresentations.  The Court finds that Plaintiffs

have submitted credible evidence to support the amount of damages jointly and severally against

Defendants Bergstrom, Destination Online, and OurID.  Cheetany has submitted a declaration

attesting to the dates and circumstances surrounding his $80,000 investment and attaching the

documents supporting that amount.  (ECF No. 15-1 at 4-5, 7-8, 26-27, 60, 62-64).  Together,

these documents demonstrate that Cheetany invested $30,000 initially and later invested $50,000.

(*Id.* at 4-5, 26-27, 60).  When Cheetany introduced his friend Marwan Hage to Bergstrom, Hage

1   invested $25,000.  (*Id.* at 5, 7-8).  After discovering Bergstrom's fraud, Cheetany confronted

2   Bergstrom, and Bergstrom repaid $25,000 to Cheetany.  (*Id.* at 7).  But Cheetany did not keep the

3   money, instead using it to buy out Hage's shares.  (*Id.* at 7-8, 62-64).  Cheetany's losses total

4   $80,000.

5          Garcia submitted a similar declaration and documents.  (ECF No. 15-2).  She explains that

6   she agreed to invest $100,000 initially and sent Bergstrom a check.  (*Id.* at 5, 29-30, 51).  Her

7   family later began investing after further misrepresentations by Bergstrom.  (*Id.* at 6, 57-59).

8   Garcia sent a check for $35,000, and her family sent checks for $15,000; $25,000; and $25,000.

9   (*Id.*).  After discovering Bergstrom's fraud, Garcia bought out her family's shares.  (*Id.*).  Garcia's

10  losses total $200,000.

11         Ravenhill submitted a declaration and supporting documents.  (ECF No. 15-3).  He

12  explains that he initially agreed to invest $700,000 and transferred the money via wire.  (*Id.* at 5,

13  28-29, 50).  He made an additional investment of $300,000 after further misrepresentations by

14  Bergstrom.  (*Id.* at 7, 57).  His losses total $1,000,000.

15         Morina also submitted a declaration and supporting documents.  (ECF No. 15-4).  He

16  invested $200,000 in three separate payments.  (*Id.* at 4, 5, 31-32, 60-61, 63-64, 68[3]).  His losses

17  total $200,000.  Finally, Defendants have consented to the granting of the motion for these fees

18  by failing to respond.  The Court recommends that Plaintiffs be awarded the $1,480,000 they

19  have alleged to have lost.

20                          2.    Punitive and statutory damages.

21         Under NRS 42.005, a Plaintiff may recover punitive damages for breaches of obligations

22  not arising from contract "where it is proven by clear and convincing evidence that the defendant

23  _____

24  [3] Morina's explanation of his last payment of $50,000 contains a typo.  Morina submits in his
    declaration that he made the final payment on December 17, 2019  (ECF No. 15-2 at 4-5).

25  However, the check he attaches shows that Morina filled it out on October 17, 2019.  (*Id.* at 68).
    Nonetheless, Morina has demonstrated and provided evidence that he made three separate checks

26  to OurID: one for $50,000, one for $100,000, and another separate one for $50,000.  *Compare*

27  (*Id.* at 60-61) (showing two checks for $25,000 each) *with* (*Id.* at 63) (a wire transfer for
    $100,000) *with* (*Id.* at 68) (a check for $50,000).  The Court thus concludes that the date

28  discrepancy is a typo.

has been guilty of oppression, fraud or malice, express or implied." An award of exemplary or punitive damages made under this section may not exceed "(a) three times the amount of compensatory damages to the plaintiff if the amount of compensatory damages is $100,000 or more; or (b) three hundred thousand dollars iof the amount of compensatory damages awarded to the plaintiff is less than $100,000." NRS 42.005(1)(a)-(b). Under NRS 42.001(2) "fraud" means "an intentional misrepresentation, deception or concealment of a material fact known to the person with the intent to deprive another person of his or her rights or property or to otherwise injure another person." NRS 598.0999(3) provides the penalties available for deceptive trade practices. It provides that the court "may require the natural person, firm, or officer or managing agent of the corporation or association [who knowingly and willfully engaged in a deceptive trade practice] to pay the aggrieved party…treble damages on all damages suffered by reason of the deceptive trade practice." NRS 598.0999(3).

"[C]ourts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered. *State Farm Mut. Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 426 (2003). The Honorable District Judge Andrew P. Gordon's decision in *Durai v. Jiangtian Sun*, stands for the proposition that, even if a plaintiff demonstrates fraud, they are not automatically entitled to punitive damages in the amount they claim. *See Durai v. Jiangtian Sun*, No. 2:19-cv-00670-APG-EJY, 2020 WL 2549951, at *1-2 (D. Nev. May 19, 2020). There, the court had already entered summary judgment in the plaintiff's favor, finding that the complaint and documents supported fraud. *See id.* But the plaintiff had not provided documents or evidence supporting the three-times-the-compensatory-damages amount the plaintiff sought. *See id.* The court thus concluded that the "purposes of punitive damages can be satisfied by a lesser amount" and lowered the award from the $345,000 the plaintiff requested to $150,000. *See id.*

The Honorable District Judge Richard F. Boulware's decision in *Spencer v. Stafford* stands for a similar proposition as *Durai. See Spencer v. Stafford*, No. 2:19-cv-01592-RFB-EJY, 2021 WL 765719, at *4 (D. Nev. Feb. 26, 2021). There, the plaintiff—an eighty-seven-year-old man with Parkinson's disease—sued the defendant who used misrepresentations to induce the

plaintiff to wire the defendant and his purported company money for a non-existent development project.  *See id.* at *1.  The court entered default judgment on the plaintiff's fraud claims and found that punitive damages were warranted based on the defendants taking advantage of the plaintiff's vulnerability.  *See id.* at *1-2.  However, because the court did not "find evidence sufficient to demonstrate that $750,000," which was three times the compensatory damages, was a "reasonable amount of punitive damages in relation to Defendants' actions" the court lowered the punitive damages amount.  *See id.* at *4.  It explained that it relied "[u]pon review of the evidence, which includes exhibits such as a declaration from Plaintiff, affidavits of service to Defendants, and e-mail correspondence between Plaintiff and Defendants" to determine that "$500,000 [was] a reasonable and calculable amount of punitive damages." *Id.*

The Court recommends awarding Plaintiffs' punitive damages, but not the entirety of the damages Plaintiffs seek.  Plaintiffs request punitive damage totaling three times the amount of their compensatory damages or, alternatively, treble damages on all actual damages suffered by reason of the deceptive trade practice under NRS 598.0999(3).  (ECF No. 15 at 28).  As a preliminary matter, the Court recommends only awarding punitive damages because those are the damages Plaintiffs request in the first instance, rather than statutory damages, which they request in the alternative.

While Plaintiffs have submitted evidence supporting their compensatory damages, they have not provided evidence supporting the triple damages they seek totaling $4,400,000.  Nor have they argued why such a high amount is justified in this case other than their arguments that Bergstrom acted knowingly and took Plaintiffs' money for himself.  Plaintiffs assert that the damages would "achiev[e] redress and dissuad[e] the Defendants from engaging in similar conduct in the future."  (ECF No. 15 at 28).  But Plaintiffs do not explain whether and to what extent they have expended additional costs trying to get their investments back, whether they have suffered business or personal setbacks because of the action, or any other circumstances which would provide context for the redress they seek.  Nor do they explain why they believe Bergstrom or his companies are likely to continue to engage in similar activities unless they are dissuaded by a significant monetary judgment.  The Court can certainly infer that Plaintiffs have

spent money bringing this action (they have hired attorneys) and that Bergstrom may continue to engage in similar actions (it appears that he was removed from EyeonID.com for spending company money on personal expenses before even starting Destination Online and OurID). But it is ultimately up to Plaintiffs to provide support for the amount of punitive damages they seek.

Because the Court finds insufficient evidence to recommend awarding treble damages, and because the Court finds that the purposes of punitive damages can be satisfied by a lesser amount, the Court recommends awarding Plaintiffs $1,000,000 in punitive damages. Based on the evidence Plaintiffs submitted, Bergstrom made similar misrepresentations to each Plaintiff to induce them into investing into companies he knew would not succeed. When confronted by the Plaintiffs, Bergstrom made excuses and ultimately stopped all communications. It appears that Bergstrom has also left the country under surreptitious circumstances.[4] This resulted in Plaintiffs commencing legal action, for which action Bergstrom, Destination Online, and OurID have accepted service but not appeared. A punitive damages award totaling $1,000,000 would constitute punitive damages totaling $250,000 for each Plaintiff. Because the Court finds that the purposes of punitive damages can be satisfied by this lesser amount, the Court recommends Plaintiffs $1,000,000 in punitive damages.

### 3.    Judgment interest.

To calculate interest, Nevada law provides:

> When no rate of interest is provided by contract or otherwise by law, or specified in the judgment, the judgment draws interest from the time of service of the summons and complaint until satisfied, at a rate equal to the prime rate at the largest bank in Nevada as ascertained by the Commissioner of Financial Institutions on January 1, or July 1, as the case may be, immediately preceding the date of judgment, plus 2 percent. The rate must be adjusted accordingly on each January 1 and July 1 thereafter until the judgment is satisfied.

---

[4] In his declaration, Morina explains that he "discovered that prior to Bergstrom's trip to Europe to purportedly meet with the OurID IT team, Bergstrom had sold his personal assets in Las Vegas, cancelled his lease of his rental home and returned his leased vehicles." (ECF No. 15-4 at 6-7).

1   *Spencer*, 2021 WL 765719, at *4 (quoting NRS 17.130(2)).

2   NRS 99.040(1) requires that:

3   Where there is no express contract in writing fixing a different rate
    of interest, interest must be allowed at a rate equal to the prime rate
4   at the largest bank in Nevada, as ascertained by the Commissioner
    of Financial Institutions, on January 1, or July 1, as the case may be,
5   immediately preceding the date of the transaction, plus 2 percent,
    upon all money from the time it becomes due…(c) Upon money
6   received to the use and benefit of another and detained without his
    or her consent…
7

8   *Spencer*, 2021 WL 765719, at *4 (quoting NRS 99.040(1)).

9   The summons and complaint were served on the last Defendant on December 7, 2020.

10  (ECF No. 12).  Computing from that date at 5.25% (3.25% prime rate established by the Nevada

11  Financial Institutions Division for January 1, 2022[5] plus 2%) to each Plaintiff's principal

12  judgment amounts yield the below:

| Plaintiff | Principal judgment amount | Annual interest at 5.25% | Daily accrual | Total interest as of the date of this report and recommendation[6] |
|-----------|---------------------------|--------------------------|---------------|---------------------------------------------------------------------|
| Cheetany | $80,000 | $4,200 | $11.51 (rounded up) | $6,457.11 |
| Garcia | $200,000 | $10,500 | $28.77 (rounded up) | $16,139.97 |
| Ravenhill | $1,000,000 | $52,500 | $143.84 (rounded up) | $80,694.24 |
| Morina | $200,000 | $10,500 | $28.77 (rounded up) | $16,139.97 |

---

[5] *See Prime Interest Rate*, STATE OF NEV., DEP'T OF BUSINESS AND INDUSTRY, FINANCIAL INSTITUTIONS, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://fid.nv.gov/uploadedFiles/fidnvgov/content/Resources/Prime%20Interest%20Rate%20January%201,%202022.pdf. (last visited June 15, 2022).

[6] Total interest is calculated by multiplying the daily accrual by the number of days since the last Defendant was served.  *See Spencer*, 2021 WL 765719, at **4-5.  Here, Bergstrom was the last Defendant served on December 7, 2020.  (ECF No. 12).  From December 7, 2020 to the date of this report and recommendation—June 21, 2022—it has been 561 days.

1

        4.    Attorneys' fees and costs.

2      While Plaintiffs include a line for attorneys' fees and costs in their proposed order, they

3   do not otherwise request attorneys' fees and costs in their motion for default judgment. *Compare*

4   (ECF No. 15-6) *with* (ECF No. 15).  They make no arguments regarding the legal basis for an

5   award of attorneys' fees or costs.  The Court thus recommends that—to the extent Plaintiffs

6   request them—their request for attorneys' fees and costs be denied. *See Durai*, 2020 WL

7   2549951, at *2 (denying plaintiff's request for attorneys' fees and costs because he did not point

8   to the legal basis for them).

9

10      **IT IS THEREFORE RECOMMENDED** that Plaintiffs' motion for default judgment

11   (ECF No. 15) be **granted in part and denied in part.**  The Court **recommends granting** default

12   judgment on Plaintiffs': (1) federal securities fraud claim; (2) state securities fraud claim;

13   (3) fraudulent misrepresentation claim; (4) deceptive trade practices and consumer fraud claim;

14   and (5) conversion claim.  The Court **recommends denying** default judgment on Plaintiffs'

15   unjust enrichment claim.

16      **IT IS FURTHER RECOMMENDED** that Plaintiffs be awarded as follows, jointly and

17   severally against Defendants Bergstrom, Destination Online, and OurID:

18   • Compensatory damages:

19      o  To Cheetany: $80,000, plus judgment interest at $11.51 per day from December7,

20         2020 until satisfied.

21      o  To Garcia: $200,000, plus judgment interest at $28.77 per day from December 7,

22         2020 until satisfied.

23      o  To Ravenhill: $1,000,000, plus judgment interest at $143.84 per day from

24         December 7, 2020 until satisfied.

25      o  To Morina: $200,000, plus judgment interest at $28.77 per day from December 7,

26         2020 until satisfied.

27   • Punitive damages:

28      o  To Cheetany: $250,000

1

      o  To Garcia: $250,000

2

      o  To Ravenhill: $250,000

3

      o  To Morina: $250,000

4

     **IT IS FURTHER RECOMMENDED** that, to the extent Plaintiffs seek attorneys' fees

5

and costs, that request be **denied.**

6

<u>**NOTICE**</u>

7

     This report and recommendation is submitted to the United States District Judge assigned

8

to this case under 28 U.S.C. § 636(b)(1). A party who objects to this report and recommendation

9

may file a written objection supported by points and authorities within fourteen days of being

10

served with this report and recommendation. Local Rule IB 3-2(a). Failure to file a timely

11

objection may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d

12

1153, 1157 (9th Cir. 1991).

13

14

     DATED: June 21, 2022

15

_____

16

DANIEL J. ALBREGTS
UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

26

27

28